# UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OKLAHOMA

NATALIE ROBINSON,          )
                                         )
                                         )
          Plaintiff,         )
                                         )
v.                               )         No.  04-CV-797-SAJ
                                         )
JO ANNE B. BARNHART,        )
Commissioner of Social Security     )
Administration,                  )
                                         )
          Defendant.       )

## OPINION AND ORDER[1]

Pursuant to 42 U.S.C. § 405(g), Plaintiff appeals the decision of the Commissioner denying Social Security benefits.[2]  Plaintiff asserts that the Commissioner erred because (1) the ALJ failed to fully and fairly develop the record; (2) the ALJ failed to conduct a proper credibility analysis, and (3) the ALJ failed to perform a proper Step Five evaluation. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

## I. FACTUAL AND PROCEDURAL HISTORY

Plaintiff was born March 7, 1970. [R. at 53].  Plaintiff was 33 years old at the time of her hearing before the ALJ.  [R. at  205].  Plaintiff graduated from high school in 1988, and completed some additional training after high school.  [R. at  206].

---

[1]  This Order is entered in accordance with 28 U.S.C. § 636(c) and pursuant to the parties' Consent to Proceed Before United States Magistrate Judge.

[2]  Administrative Law David W. Engel (hereafter "ALJ") concluded that Plaintiff was not disabled by decision dated April 26, 2004.  [R. at 11 - 23].  Plaintiff appealed the decision by the ALJ to the Appeals Council.  The Appeals Council declined Plaintiff's request for review on August 19, 2004. [R. at 6].

Plaintiff was interviewed by a social security field officer on September 19, 2002. The field officer reported that Plaintiff walked and moved slowly, and was polite and cooperative. [R. at 66]. Plaintiff reportedly had no difficulty hearing, reading, understanding, answering, sitting, standing, or using her hands during the interview. [R. at 66].

Plaintiff completed a disability report on September 18, 2002. [R. at 68]. Plaintiff indicated that she believed she was disabled because she suffered from a broken tail bone, chronic back pain, thyroid problems, right hand swelling, chronic pain, and obesity. [R. at 69]. Plaintiff noted that she was unable to sit or stand for extended periods of time and that she was required to sit in chairs which had arms. [R. at 69].

Plaintiff indicated that she became unable to work on June 24, 2002. According to Plaintiff, she was "discharged for break abuse." Plaintiff noted that she had several "write-ups" within a one week period and that she tried to get longer breaks to accommodate her condition. [R. at 69].

In her disability report, Plaintiff wrote that she broke her tail bone when she was 15 years old and has suffered from chronic pain since that date. [R. at 76]. Plaintiff noted that her pain had increased since the birth of her second child. [R. at 76].

Plaintiff described her average day on a social security form. [R. at 86]. Plaintiff wrote that she assisted her oldest daughter in preparing for school, and rested until her baby awoke. Plaintiff fed and diapered her baby and tried to clan up around the house. Plaintiff rested when necessary. [R. at 86]. In the afternoon, Plaintiff went to the chiropractor and picked her oldest daughter up from school. [R. at 86]. According to Plaintiff, she is unable to sit or stand comfortably for any length of time. Plaintiff indicated that she slept only two or three hours at a time, and tossed and turned most of the night.

[R. at 86].  Plaintiff wrote that she was unable to lay flat because her tail bone sticks out and that she is required to lay on her side.  Plaintiff wrote that she was unable to lift her baby or carry things.  [R. at  86].  According to Plaintiff, she prepares dinner and a full breakfast on weekends.  Plaintiff noted that it took her one and one-half hours to cook.  [R. at  87].  Plaintiff also sorts and fold clothes and loads the washing machine.  [R. at  88].  Plaintiff noted that she does laundry every two weeks and daily does house cleaning and cooking chores.  [R. at  88].  Plaintiff shops weekly for food and household items.  [R. at 88].  Plaintiff reads books to her children and magazines or newspapers for 15 to 20 minutes.  [R. at  89].  Plaintiff watches videos and movies for three or four hours each day.  [R. at  89].  Plaintiff surfs the internet, writes, and does some arts and crafts with the kids for three to four hours each week.  [R. at  89].

On September 4, 2003, Plaintiff completed a form with the Social Security Administration.  Plaintiff wrote that she suffered from chronic edema (bloating), swelling, and tingling of her hands, legs, and feet, and excessive irregular bleeding.  [R. at  96].  Plaintiff wrote that she was unable to perform regular household work because she was always cramping, hurting, and bleeding. [R. at 96].  Plaintiff's medication list, dated March 29, 2004, lists thyroid, blood pressure, and wheezing medications.  [R. at  101].

Plaintiff was admitted to Hillcrest Medical Center on April 19, 2001, and discharged on April 21, 2001, for an elective repeat cesarean section at 39 weeks.  [R. at  102].  Plaintiff tolerated the procedure well.  [R. at  106].  Plaintiff underwent a laparoscopic bilateral tubal fulguration on July 20, 2001.  [R. at  110].  The postoperative and preoperative diagnosis indicated multiparous and desired fertility.  [R. at  110].

On October 1, 2001, Plaintiff had an ultrasound for an enlarged uterus. [R. at 121]. Plaintiff was seen on November 1, 2002, for a prolonged menses. Plaintiff was told to follow-up if her situation was worse in ten days. [R. at 141]. Chlamydia testing was normal. [R. at 143].

Plaintiff was examined by Steven Y.M. Lee, M.D., on December 13, 2002. [R. at 144]. The record indicates that Plaintiff told the doctor that her chiropractor told her not to work and that her chief complaint was pain. [R. at 144]. Plaintiff reported a history of asthma in 1997 and 1998. [R. at 144]. Plaintiff was 5'4" tall and weighed 248 pounds. [R. at 144]. Plaintiff had a mild limitation without pain in the flexion of both of her knees, elbows, the right thumb and the middle phalanx of all fingers. Plaintiff had no evidence of joint deformity, redness, swelling, heat, or tenderness. [R. at 144]. Flexion, extension, and bending of the back were all normal. [R. at 144]. Heel and toe walking were normal. Plaintiff's hand grip was 5+/5+, and her muscle strength of her forearms, arms, legs, and feet was 5+/5+. [R. at 145]. Plaintiff's diagnosis was chronic pain syndrome by history and obesity. Plaintiff reported taking Ibuprofen for relief of her pain. [R. at 145]. The doctor indicated that Plaintiff can effectively oppose the thumb to her finger tips, handle small objects, and grasp small tools. [R. at 148].

A Physical Residual Functional Capacity Assessment was completed by Thurma Fiegel, M.D., on December 13, 2002. [R. at 151]. Plaintiff was noted as being able to occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk two hours in an eight hour day, and sit six hours in an eight hour day, and push or pull an unlimited amount. [R. at 152]. Dr. Fiegel noted that Plaintiff alleged constant back pain and a tail bone fracture, but that such complaints were not documented by the reports in the record. [R. at 152].

-- 4 --

A Physical Medical Source Statement was completed by C. Cole, D.C., on April 22, 2003.  [R. at  159].  Plaintiff was noted as being able to sit, stand, or walk for 10 to 30 minutes at one time, or sit for four hours during an eight hour day, or stand or walk for 10 to 30 minutes during an eight hour day.  [R. at  159].  Plaintiff was noted as able to occasionally lift or carry five to ten pounds.  [R. at  159].  Dr. Cole was Plaintiff's chiropractor.  [R. at  162].  On October 24, 2002, Plaintiff complained of chronic back pain, shoulder and neck pain, and indicated she could not sit, lay or stand for long periods of time.  [R. at  164].

Plaintiff had x-rays on October 7, 2003, which were interpreted by Sidney Williams, M.D.  [R. at  167].  Dr. Williams wrote that the x-rays were "fundamentally normal except for very **mild** joint space narrowing between the L5 and S1 interspaces.  No osteophytes, dislocations, fractures, scoliosis, or abnormal curvatures."  [R. at  167, bold in original].  X-rays of the ankle, right , AP and Lateral were interpreted as normal.  X-rays of the left ankle were normal.  [R. at  167].  Interpretations which appear to be from Plaintiff's chiropractor note that Plaintiff has hypolordosis of the cervical spine, and that an anterior compression of the T8 vertebral body, bilateral facet imbrication of L5/S1 and an old fracture of the sacrococcygeal segment.  [R. at  166].

Minor W. Gordon, Ph.D., completed a psychological evaluation on October 15, 2003. Plaintiff reported having two daughters – ages nine and two.  [R. at  172].  Plaintiff walked without notable difficulty.  [R. at  173].  Plaintiff's activities of daily living were described as normal.  [R. at  173].  Plaintiff's global assessment of functioning ("GAF") was reported as 70.  [R. at  174].

A Mental Medical Source Statement was completed by Dr. Gordon on October 21, 2003.  [R. at  169-71].  He noted that Plaintiff had no significant limitation in the ability to understand, carry out, and remember detailed instructions, in the ability to maintain attention, perform activities within a schedule, work with others and make simple work-related decisions.  All remaining categories were marked as either no significant limitation, or no limitation.  [R. at  168-69].

Plaintiff was examined by Sri K. Reddy, M.D., on October 27, 2003.  [R. at  175].  Plaintiff complained of constant and daily pain all over her body.  [R. at  175].  Plaintiff's muscle strength was 5/5 in the upper and lower extremities on the right and left.  Plaintiff's reflexes were equal and symmetric.  [R. at  176].  Plaintiff had functional range of motion of her right and left upper extremity at the shoulder, elbow, wrist, and fingers.  Plaintiff had functional range of motion in her right and left lower extremity.  [R. at  176].  Plaintiff had functional range of motion of her cervical and lumbar spine.  [R. at  176].  The doctor also noted that he performed an EMG of Plaintiff's "right upper extremity and her left lower extremity."  The doctor reported that Plaintiff had a normal EMG examination of her "left upper and right lower extremities."  [R. at  176].  The doctor concluded that Plaintiff could sit for eight hours at a time; stand for eight hours at a time, and walk for eight hours at time.  [R. at  177].

Plaintiff's vision was tested on October 29, 2003.  [R. at  180].  Plaintiff's vision was reported as 20/20, and Plaintiff had a good examination with no treatment recommended.  [R. at  180].

Plaintiff testified at a hearing before the ALJ on September 4, 2003.  [R. at  197].  The ALJ asked Plaintiff about her asserted problem related to her tail bone and noted that

he had no records substantiating that claim.   Plaintiff stated that she fell on her 15th birthday and was never actually treated for her injury.  [R. at  203].  According to Plaintiff, she has always had problems with her tail bone, and Dr. Cole took x-rays and showed them to her, and she knew that she was injured.  [R. at  203].

At the hearing Plaintiff stated that she was 5'4" tall and weighed approximately 240 to 250 pounds.  [R. at  205].  According to Plaintiff, she last drove approximately three months prior to the hearing.  Plaintiff noted that her car was not working, and that she was unable to drive for any length of time due to her arm and back difficulties.  [R. at  207].

Plaintiff's children were nine and two at the time of the hearing before the ALJ.  [R. at  208].

Plaintiff testified that she is unable to work because she is in constant pain.  Plaintiff described pain in her legs, arms, back, and neck.  Plaintiff testified that she has "female problems" and bleeds all of the time, and that she is unable to lift more than five pounds without bleeding.  [R. at  208].  Plaintiff stated that OU had performed several tests to attempt to determine why she bleeds but that Plaintiff was still in the process of trying to determine what was the cause.  [R. at  209].  Plaintiff testified at the September 4, 2003 hearing, that the last time that she saw the OU people was in February of the current year. [R. at  209].

Plaintiff additionally testified that she experiences problems with her hips and the backs of her legs, and that she has an injury to her left leg.  [R. at  210].  According to Plaintiff, she was injured as a child and never went to a doctor.  Since that time, Plaintiff reports that her leg swells constantly behind her ankle and that it hurts.  Plaintiff stated that she tried to get x-rays done, but that she lacks the funds for x-rays.  [R. at  210].

Plaintiff noted that her hand also stays constantly swollen.  According to Plaintiff, she has had several doctors look at her hand and tell her that it was a restriction.  [R. at 211]. Plaintiff stated that her pain included numbness, tingling, and sharp pains.  [R. at 211]. Plaintiff indicated that she experiences headaches which interfere with her ability to sleep. [R. at 213].  Plaintiff also stated that she experienced some depression and that she cried. [R. at 214].

Plaintiff indicated that she became disabled on June 24, 2002.  Plaintiff noted that she was unable to maintain her employment due to her health problems.  [R. at 216]. Plaintiff testified that she was fired due to "break abuse."  Plaintiff testified that she was attempting to get her place of employment to give her more breaks, but that she was fired before they granted her that accommodation.  [R. at 216].

During a regular day, Plaintiff stated that since school has started, she wakes up around 7:30 a.m. and helps her daughter get ready for school, and then lays down.  [R. at 220].  Plaintiff believes that on three days out of seven she remains in bed for the entire day.  [R. at 220].  Plaintiff stated that she does cook, but that she has to sit down and rest while cooking.  [R. at 221].  On days when Plaintiff is bedridden, she states that the other adult in the house performs the cooking.  [R. at 221].  Plaintiff testified that she tries to do laundry once each week, and she sits to sort the laundry.  [R. at 222].  Plaintiff indicated that she is unable to vacuum an entire room.  [R. at 222].  Plaintiff believes she can walk for approximately five to ten minutes before she would be required to rest.  [R. at 223]. Plaintiff believes she could sit for about one hour in a comfortable chair before she would be required to move.  [R. at 224].  Plaintiff shops for groceries approximately one time

each month and her children and another adult lift items off of the shelf for her.  [R. at  225].

According to Plaintiff, she has significant grip problems and cannot open lids off of jars or open the lid off of a baby cup.  [R. at  229].  Plaintiff testified that she really did not currently have a social life because most of her friends were at her work, and she no longer worked.  [R. at  231].

Plaintiff participated in a supplemental hearing before the ALJ on March 29, 2004. [R. at  237].  The primary purpose of the supplemental hearing was to obtain the testimony of a vocational expert.

## II. SOCIAL SECURITY LAW AND STANDARD OF REVIEW

The Commissioner has established a five-step process for the evaluation of social security claims.  *See* 20 C.F.R. § 404.1520.  Disability under the Social Security Act is defined as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . .

42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Social Security Act only if his

> physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy. . . .

42 U.S.C. § 423(d)(2)(A).[3]

---

[3]  Step One requires the claimant to establish that he is not engaged in substantial gainful activity (as defined at 20 C.F.R. §§ 404.1510 and 404.1572).  Step Two requires that the claimant demonstrate that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 1521.  If claimant is engaged in substantial gainful activity (Step One) or if claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, claimant's

The Commissioner's disability determinations are reviewed to determine (1) if the correct legal principles have been followed, and (2) if the decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).

The Court, in determining whether the decision of the Commissioner is supported by substantial evidence, does not examine the issues *de novo*. *Sisco v. United States Dept. of Health and Human Services*, 10 F.3d 739, 741 (10th Cir. 1993). The Court will not reweigh the evidence or substitute its judgment for that of the Commissioner. *Qualls v. Apfel*, 206 F.3d 1368 (10th Cir. 2000); *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994). The Court will, however, meticulously examine the entire record to determine if the Commissioner's determination is rational. *Williams*, 844 F.2d at 750; *Holloway v. Heckler*, 607 F. Supp. 71, 72 (D. Kan. 1985).

"The finding of the Secretary[4/] as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is that amount and type of evidence that a reasonable mind will accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Williams*, 844 F.2d at 750. In terms of

---

impairment is compared with those impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings"). If a claimant's impairment is equal or medically equivalent to an impairment in the Listings, claimant is presumed disabled. If a Listing is not met, the evaluation proceeds to Step Four, where the claimant must establish that his impairment or the combination of impairments prevents him from performing his past relevant work. A claimant is not disabled if the claimant can perform his past work. If a claimant is unable to perform his previous work, the Commissioner has the burden of proof (Step Five) to establish that the claimant, in light of his age, education, and work history, has the residual functional capacity ("RFC") to perform an alternative work activity in the national economy. If a claimant has the RFC to perform an alternate work activity, disability benefits are denied. *See Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

[4/]   Effective March 31, 1995, the functions of the Secretary of Health and Human Services ("Secretary") in social security cases were transferred to the Commissioner of Social Security. P.L. No. 103-296. For the purpose of this Order, references in case law to "the Secretary" are interchangeable with "the Commissioner."

traditional burdens of proof, substantial evidence is more than a scintilla, but less than a preponderance. *Perales*, 402 U.S. at 401. Evidence is not substantial if it is overwhelmed by other evidence in the record. *Williams*, 844 F.2d at 750.

This Court must also determine whether the Commissioner applied the correct legal standards. *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The Commissioner's decision will be reversed when he uses the wrong legal standard or fails to clearly demonstrate reliance on the correct legal standards. *Glass*, 43 F.3d at 1395.

## III.  ADMINISTRATIVE LAW JUDGE'S DECISION

The ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform a full range of light or sedentary work. The ALJ concluded that Plaintiff was additionally limited to walking or standing for two hours in an eight hour day; was unable to climb ropes or ladders or work on unprotected heights. He concluded Plaintiff was able to understand, remember, and carry out simple to moderately detailed instructions in a work-related setting. The ALJ found that Plaintiff could not perform her past relevant work ("PRW"). Based on the testimony of a vocational expert, the ALJ found that Plaintiff could perform a substantial number of jobs in the national economy.

## IV.  REVIEW

### Duty to Develop the Record

Plaintiff asserts that the ALJ has a duty to develop the record, and that this duty is heightened when an individual has a mental disability. Plaintiff does not detail the exact nature of Plaintiff's asserted "mental disability." The ALJ referred Plaintiff for a mental health examination. Plaintiff was examined by Dr. Gordon on October 15, 2003. He

reported Plaintiff's GAF as 70, and concluded that Plaintiff had no significant limitation in her abilities.

Plaintiff further asserts that the ALJ erred by not developing the record in obtaining two type of reports. First, Plaintiff asserts that the ALJ was at fault for not obtaining additional records from the University of Oklahoma clinic which Plaintiff visited and which Plaintiff testified was addressing her abnormal bleeding. Second, Plaintiff asserts that the ALJ should have contacted Plaintiff's employer for confirmation that Plaintiff was fired because Plaintiff required too many breaks at work.

A social security disability hearing is a non-adversarial proceeding. The claimant has the general duty to establish disability, and an ALJ has a duty to develop the factual record. *See Musgrave v. Sullivan*, 996 F.2d 1371, 1374 (10th Cir. 1992). The statutes require that "[i]n making any determination the Commissioner of Social Security shall make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, <u>necessary in order to properly make such determination</u>, prior to evaluating medical evidence obtained from any other source on a consultative basis." 42 U.S.C. § 423(d)(5)(B) (emphasis added).

In *Musgrave*, the Tenth Circuit Court of Appeals, in examining the duty of the ALJ to develop the record concluded that the "important inquiry is whether the ALJ asked sufficient questions to ascertain (1) the nature of a claimant's alleged impairments, (2) what on-going treatment and medication the claimant is receiving, and (3) the impact of the alleged impairment on a claimant's daily routine and activities." *Musgrave*, 966 F.2d at 1374.

-- 12 --

The Court cannot conclude, under the facts of this case, that the ALJ failed to adequately develop the record.  First, as noted in the statutes, the ALJ's duty to develop is with respect to those documents which are necessary to the determination.  The Court cannot conclude that the two types of documents referenced by Plaintiff are necessary to this determination.  Plaintiff suggests the ALJ should have contacted Plaintiff's place of work to determine if Plaintiff was actually fired because she took too many breaks.  Plaintiff does not explain this argument or develop how this argument would support Plaintiff's assertion that the ALJ's decision should be reversed.  Plaintiff volunteered that she was fired and stated that the reason was because she took too many breaks.  The ALJ accepted Plaintiff's explanation.  If the ALJ contacted Plaintiff's place of work and learned she was fired for a different reason the Court is at a loss to understand how this would assist Plaintiff's argument with regard to credibility.  Plaintiff additionally complains that the ALJ should have obtained additional medical records from OU regarding Plaintiff's treatment for menstrual bleeding.  However, the ALJ contacted OU in February 2003 and requested all medical documents from November 2002 to present.  [R. at 140].  The ALJ made the effort necessary to obtain such records.  The records from OU which are in the record indicate that Plaintiff complained of a prolonged menses.  Plaintiff was to follow-up if her condition had not improved within ten days.  According to Plaintiff, at the time of her hearing in September 2003, she had last seen OU for treatment related to this problem in February 2003. Therefore the Court is not convinced that the records which Plaintiff asserts are missing were "necessary" to the decision of the ALJ as required by the statute.

As noted, the ALJ sent a specific request for the OU medical records in February 2003.  Furthermore, the ALJ informed Plaintiff several times that if Plaintiff wished for

additional evidence to be considered by the ALJ that Plaintiff should submit that evidence. *See* [R. at 55 (request for hearing), R. at 26, 30 (notice of hearing for the initial and the supplemental hearing), R. at 244-45 (conclusion of supplemental hearing)].  Plaintiff never submitted the documents.  Plaintiff never requested assistance from the ALJ in obtaining the documents.  And, even on appeal, the attorneys representing Plaintiff have evidently not obtained the documents and do not know the contents of the documents.  The Court is simply not persuaded that the absence of such documents from this record requires reversal of the decision by the ALJ.

Finally, the ALJ did develop the medical evidence in this action by referring Plaintiff for consultative physical and mental examinations, and by holding a hearing at which Plaintiff testified.  The Court cannot conclude that the ALJ failed in his duty to develop the record.

## CREDIBILITY ANALYSIS

Credibility determinations in particular lie in the domain of the finder of fact.  *See McGoffin v. Barnhart*, 288 F.2d 1248, 1254 (10th Cir. 2002); *Hamilton v. Secretary of Health & Human Services*, 961 F.2d 1495 (10th Cir. 1992).  An ALJ's finding with regard to credibility is afforded great deference.

> The ALJ enjoys an institutional advantage in making the type of determination at issue here.  Not only does an ALJ see far more social security cases than do appellate judges, he or she is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.  As a result, the ALJ's credibility findings warrant particular deference.

*White v. Barnhart*, 287 F.3d 903, 910 (10th Cir. 2002).  On appeal, the court's role is to verify whether substantial evidence in the record supports the ALJ's decision, and not to substitute the court's judgment for that of the ALJ.

Plaintiff lists numerous separate issues as supporting Plaintiff's argument that the ALJ improperly evaluated Plaintiff's credibility.  First, Plaintiff asserts that the doctor who conducted Plaintiff's second consultative evaluation erred in concluding that Plaintiff had the RFC to sit for eight hours in an eight hour day; stand for eight hours in an eight hour work day, and walk for eight hours in an eight hour work day.  Plaintiff states that this is obviously flawed because a work day is only eight hours rather than 24 hours.  Plaintiff's argument is without merit.  The form provides that the doctor should indicate, for each activity, the "full capacity" of the individual to sit, stand, and walk.  The form does not require or even ask the doctor to apportion the number of hours in an eight hour day between the physical activities of sitting, standing, or walking to total eight hours.  The second consultative examiner, Dr. Reddy, simply concluded that Plaintiff could sit for eight hours or walk for eight hours or stand for eight hours.  This is the only reasonable interpretation of the form and the doctor's findings.  The Court concludes that the doctor's conclusions were not internally inconsistent.

Plaintiff also asserts that Dr. Reddy's analysis is internally inconsistent and should not be relied upon by the ALJ because the examiner performed an electromyogram on the right upper and left lower extremities but reported that Plaintiff had normal responses in the left upper and right lower extremities.  The Court cannot conclude that the doctor's reversal of right and left with respect to what was tested and the results of an EMG requires the ALJ to completely disregard the doctor's report.  Dr. Reddy examined Plaintiff.  He reported his

results, and the test about which Plaintiff complains is listed as an "addendum." [R. at 176].

Plaintiff asserts that the non-examining opinions of the State agency must be ignored because they did not include Plaintiff's decreased range-of-motion of several joints. However, Plaintiff refers to the range of joint motions listed by Dr. Lee in his examination of Plaintiff. Dr. Lee reported that Plaintiff had very few restrictions on her range-of-motions. He noted that Plaintiff's knee flexion was 130 out of 150 and her elbow flexion was 130 out of 150, and her right thumb was 50 out of 70. All restrictions were listed as "no pain." The examiner included no other limitations of Plaintiff's range-of-motions. Nothing suggests that these restrictions were ignored by other non-examining doctors in the record. In fact, Plaintiff's examination was primarily normal and Plaintiff's hand grip strength was reported as 5+/5+. [R. at 145].

Plaintiff also complains that the conclusions of the non-examining physicians must be ignored because the doctors listed limitations but noted that Plaintiff was completely normal "except for pain and obesity." Plaintiff seems to suggest that if the doctors did not consider these factors than their results must be ignored. This conclusion is not intuitive. Because the non-examining doctors noted pain and obesity as factors which might further limit Plaintiff's otherwise normal results it is simply left to the ALJ to interpret the weight to be given to such results and the limitations, if any, imposed by Plaintiff's asserted pain and documented obesity.

Plaintiff asserts that the ALJ erred by rejecting the RFC by Plaintiff's chiropractor. However, the ALJ considered the opinion by Plaintiff's chiropractor. The ALJ noted that opinions are considered from "acceptable medical sources," and that a chiropractor's

opinion is not included within that definition.  The ALJ discussed the weight that he gave to the chiropractor's opinion and Plaintiff does not otherwise challenge the ALJ's assessment of the chiropractor's opinion.

Plaintiff asserts that the ALJ did not accept the "second" consultative evaluation (Dr. Reddy) because it appeared to be based upon objective medical examination without evaluation of Plaintiff's subjective complaints.  Dr. Reddy concluded that Plaintiff could sit for eight hours, stand for eight hours, or walk for eight hours in an eight hour day.  This examination supports the ALJ's conclusion that Plaintiff is able to perform light or sedentary work.  In determining Plaintiff's RFC the ALJ found that Plaintiff had some limitations in addition to those noted by Dr. Reddy.  The ALJ does not err by placing additional limitations upon a Plaintiff that are in addition to those supported by a medical doctor.

The ALJ additionally noted that Plaintiff is able to perform certain activities of daily living including some household chores.  Plaintiff asserts that this is error because an ALJ cannot conclude, based on the performance of a limited number of daily activities, that a claimant can work.  An ALJ is, however, permitted to refer to the performance of daily activities as contradicting Plaintiff's previous assertions, and as reflecting upon Plaintiff's credibility.  *See, e.g., Bean v. Chater*, 77 F.3d 1210 (10th Cir. 1995) (consideration of Plaintiff's reported inconsistencies in her report of daily activities appropriate for consideration by ALJ); *Gosset v. Bowen*, 862 F.2d 802, 807 (10th Cir. 1988) (consideration of daily activities appropriate in disability application).  The ALJ noted that Plaintiff had suggested that her impairments bothered her since 1985, but that Plaintiff worked during that time and that nothing in the medical evidence suggested a deterioration of Plaintiff's impairments.  [R. at 19].  The ALJ listed some of the daily activities that Plaintiff noted in

completing her social security reports and in her testimony.  The ALJ additionally observed that Plaintiff takes care of a school age child and a preschool child.  [R. at 16].  Nothing in the ALJ's decision indicates that the ALJ ignored the Plaintiff's testimony or her statements regarding the limitations of the activities which she performs.

Plaintiff notes the ALJ's reference to her "lack of friends" and suggests that the ALJ did not understand that Plaintiff's social activities are limited because she has lost interest in doing activities.  However, the ALJ's findings are supported by substantial evidence. Plaintiff was asked if she liked to be around people, or if people bothered her.  Plaintiff answered, "I like being around people.  I mean, I'm a people person as far as talking to people and getting along with people.  It's just I'm not – I don't really have any friends right now that I can talk to.  Since I've lost my job, I mean, most of my friends were at work. People that I was acquainted with.  So I really don't have a social life to speak of."  [R. at 231].

Many of Plaintiff's assertions with regard to error in the record are in relation to the ALJ's evaluation of Plaintiff's alleged mental impairment.  The ALJ referred Plaintiff to a psychologist, Dr. Gordon, who examined Plaintiff.  He reported that Plaintiff was either not significantly impaired or had no limitation in all categories.  [R. at  168-69].  The ALJ's findings with regard to Plaintiff's asserted mental impairment are supported by substantial evidence.

Plaintiff notes that the ALJ referred to her past work history and indicated that nothing in the medical record suggested a significant deterioration in Plaintiff's capabilities during the time frame that Plaintiff worked and stopped working.  Plaintiff asserts that this finding is inappropriate because the ALJ is inserting his medical expertise into the record.

However, the ALJ is permitted to draw conclusions based upon the medical record.  And, based upon this record, one conclusion is that nothing in the record supports a significant deterioration in Plaintiff's medical condition.  Plaintiff also asserts that the ALJ's conclusion is inappropriate because an ALJ cannot require objective medical evidence to support the degree of Plaintiff's pain.  Plaintiff is correct.  However, the ALJ is merely using the fact that Plaintiff worked and that the medical evidence does not suggest a significant change in her condition since she stopped working as one factor in evaluating Plaintiff's credibility.  This is not reversible error.  Finally, Plaintiff suggests that the ALJ is improperly requiring more than a "loose nexus" between Plaintiff's medically demonstrable impairment and Plaintiff's pain, contrary to *Luna*.  However, as Plaintiff acknowledges, the  ALJ did not discount Plaintiff's credibility at the first step of *Luna*, but instead proceeded to fully evaluate Plaintiff's credibility.

Plaintiff makes several references to Plaintiff's "abnormally low bilateral grip strength."  However, Plaintiff does not make a reference to the record to support Plaintiff's assertion that she has a low grip strength.  Dr. Lee noted, in his examination of Plaintiff, that her hand grip strength was 5+/5+ and that intrinsic function of the hands was normal. [R. at 145].  Regardless, the ALJ did note a reduced grip strength in one hand (based upon Dr. Reddy's examination), but the record contains substantial evidence to support the ALJ's findings with regard to Plaintiff's RFC and ability to perform the requirements of sedentary and light work.

Plaintiff asserts that the ALJ ignored doctor interpretations of Plaintiff's x-rays of her ankle that her joint space had narrowed and physical examinations that she had a reduced range-of-motion of some finger and thumb joints.  Dr. Williams interpreted Plaintiff's x-rays

as "fundamentally normal except for very **mild** joint space narrowing between the L5 and S1 interspaces. No osteophytes, dislocations, fractures, scoliosis, or abnormal curvatures." [R. at 167, bold in original]. X-rays of the ankle, right , AP and Lateral were interpreted as normal. X-rays of the left ankle were normal. [R. at 167]. The examiner who found some limited range-of-motion reductions in Plaintiff's finger, thumb, knee and elbows concluded that Plaintiff could effectively oppose the thumb to the finger tips, could manipulate small objects, and could effectively grasp a tool. [R. at 147]. Nothing in the medical records referenced by the Plaintiff is inconsistent with the ALJ's findings as to Plaintiff's RFC.

Plaintiff suggests that the ALJ ignored her medication history and that the ALJ should have discussed her medications in his evaluation of her credibility. Plaintiff is correct, the ALJ did not discuss her medications with respect to his analysis of Plaintiff's credibility. However, the Court concludes that the ALJ's evaluation of Plaintiff's credibility was sufficient and the omission of a discussion of Plaintiff's medication lists is not error. The Court additionally notes that Plaintiff testified that she took Ibuprofen for relief from pain, and did not testify as to any prescription medications for pain.

### STEP FIVE ANALYSIS

Plaintiff first asserts that the ALJ's decision is internally inconsistent. Plaintiff notes that the ALJ found that Plaintiff was not disabled but that the ALJ's decision also contains a statement which is inconsistent with a decision of not disabled. The ALJ's decision states: "[T]he ALJ further concludes that other jobs that the claimant can perform do not exist in significant numbers in the national economy." [R. at 14]. Plaintiff is correct that this statement does appear in the introductory paragraphs of the ALJ's decision under the sub-

heading of "holding."  Further, such a conclusion is contrary to the ALJ's finding that Plaintiff can perform substantial work in significant numbers in the national economy. However, such a statement is, given the holding of the ALJ, best interpreted as a typographical error.  The Court will not reverse the ultimate conclusions of the ALJ, when supported by substantial evidence, simply because one sentence in the ALJ's decision mistakenly includes the work "not."

Plaintiff asserts that the ALJ did not include Plaintiff's "weak grip" in the hypothetical presented to the vocational expert.  Plaintiff notes that if a person cannot reach, handle, or finger frequently, that person cannot perform repetitive work.  However, Plaintiff's argument leaps from a finding that Plaintiff has a weaker grip in her right hand, which has some support in the medical record, to a conclusion that a weaker grip translates into a finding that the person cannot reach, handle, or finger frequently.  The ALJ noted Plaintiff's weak grip strength.  However, the ALJ found that Plaintiff had the manual dexterity to perform both sedentary and light work.  This finding is supported by the record.  Dr. Lee found that Plaintiff's hand grip was 5+/5+, and her muscle strength of her forearms, arms, legs, and feet was 5+/5+.  [R. at  145].  Dr. Lee determined that Plaintiff could effectively oppose the thumb to her finger tips, handle small objects, and grasp small tools.  [R. at  148].   Dr. Reddy, M.D. noted Plaintiff's muscle strength was 5/5 in the upper and lower extremities on the right and left.  [R. at 175].  An RFC assessment indicates Plaintiff can perform light or sedentary work.  The record does not contain medical support for a finding that Plaintiff cannot reach, handle, or finger.  The Court concludes that the ALJ's finding is supported by substantial evidence.   An ALJ is only required to include those limitations in the hypothetical question to the vocational expert which are supported by the record.  *Evans*

*v. Chater*, 55 F.3d 530, 532 (10th Cir. 1995) (an ALJ need include only those limitations in the question to the vocational expert which he properly finds are established by the evidence); *Talley v. Sullivan*, 908 F.2d 585, 588 (10th Cir. 1990).

Finally, Plaintiff asserts that because the ALJ found that Plaintiff did not have transferable skills, Plaintiff is limited to unskilled work.  Plaintiff then asserts that the ALJ erroneously concluded that Plaintiff could perform sedentary semiskilled jobs (data entry and receptionist) which are above the "unskilled" level.  Plaintiff states that she is limited to jobs with an SVP of 2 or less.  This argument is not well developed by Plaintiff.

The vocational expert testified that several jobs existed which Plaintiff could perform.  First, the vocational expert noted the job of sedentary data entry clerk.  According to the vocational expert, there are 658,000 jobs nationally, and 73,000 regionally.  The ALJ listed this job at a SVP of 3.  Second, is the job of sedentary receptionist with 600,000 nationally and 75,000 regionally.  The ALJ listed this job at an SVP of 3.  The vocational expert also testified that Plaintiff could perform the unskilled job of assembly work (SVP of 2), or machine operator (SVP of 2) and sedentary assembly work.  The vocational expert reduced the available job numbers for these positions based upon a sit/stand option.

Plaintiff's argument presumes that an SVP of 3 is equal to semiskilled work and assumes that if an individual does not have transferrable skills they have no ability to perform a job with the SVP of 3.  Plaintiff concludes that Plaintiff is capable of performing jobs which are limited to an SVP of 2 or lower because Plaintiff does not have transferrable skills.  Plaintiff's assumptions are not supported by the available materials.

In the Dictionary of Occupational Titles, SVP stands for "specific vocational preparation."  Each job contains a number which equates to the amount of vocational

preparation time that is necessary for the performance of the job.  The DOT additionally notes that the vocational preparation can include special vocational training, <u>on the job training</u>, vocational education, apprenticeship, in-plant training, or experience in other jobs. *See* Dictionary of Occupational Titles, at 1009 (4th ed. 1991) (*emphasis added*).

The DOT also provides an SVP scale.  An SVP of "three" indicates that a job requires more than one month and up to three months of training.  In addition, this time "does not include the orientation time required of a fully qualified worker to become accustomed to the special conditions of any new job."  *See* Dictionary of Occupational Titles, at 1009 (4th ed. 1991).

The social security regulations provide that the administration takes "administrative notice" of "reliable job information available from various governmental and other publications . . . [including] the Dictionary of Occupational Titles." 20 C.F.R. § 404.1566(d). However, as becomes evident from a comparison of the DOT and the social security regulations, the two are not an exact match.[5/]  The social security regulations define "unskilled work" as "work which needs little or no judgment to do simple duties that can be learned <u>on the job</u> in a short period of time.  The job may or may not require considerable strength . . . and a person can <u>usually</u> learn to do the job in 30 days, and little specific vocational preparation and judgment are needed."  20 C.F.R. 404.1569(a) (emphasis added).  No specific "time guidelines" are provided for semi-skilled work or skilled work.

---

[5/]   The DOT also notes that "[o]ccupational definitions in the DOT are written to reflect the most typical characteristics of a job as it occurs in the American economy.  Task element statements in the definitions may not always coincide with the way work is performed in particular establishments or localities."  *See* Dictionary of Occupational Titles, at 1009 (4th ed. 1991).

The definition in the regulations for unskilled work, which can include on the job training usually learned within 30 days is not in direct and obvious conflict with an SVP rating of three, which can include on the job training of one month to three months. Therefore, in accordance with the DOT, the definitions and training requirements of an SVP of 3, and the regulations which define unskilled work, it is possible for an unskilled (as defined by the regulations) to have an SVP of 3 in accordance with the DOT.  The Court cannot therefore conclude that the ALJ's finding that Plaintiff can perform the data entry work and the receptionist job, as stated by the vocational expert, is not supported by substantial evidence.

Dated this 19th day of October 2005.

Sam A. Joyner
United States Magistrate Judge